359 F.Supp. 760 (1973)
ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Plaintiff,
v.
ARMCO STEEL CORPORATION, an Ohio steel corporation, Defendant.
PULLMAN INCORPORATED, a Delaware corporation, Defendant and Third-Party Plaintiff,
v.
MARYLAND CASUALTY COMPANY, a Maryland stock insurance company, Third-Party Defendant.
No. 70 C 636(1).
United States District Court, E. D. Missouri, E. D.
May 16, 1973.
As Amended June 4, 1973.
Jenner & Block, Chicago, Ill., and Engle & Kopper, St. Louis, Mo., for plaintiff.
Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, Mo., for Armco Steel Corp. and Maryland Casualty.
Evans & Dixon, St. Louis, Mo., for Pullman, Inc.

*761 FINDINGS OF FACT AND CONCLUSIONS OF LAW
MEREDITH, Chief Judge.
This case was tried to the Court and the Court makes the following findings of fact and conclusions of law with respect to the principal cause of action between the St. Louis-San Francisco Railway Company and defendants Armco Steel Corporation and Pullman Incorporated.

Findings of Fact
1. Plaintiff, St. Louis-San Francisco Railway Company hereinafter referred to as "Frisco", is a corporation organized under the laws of the State of Missouri, with its principal place of business in St. Louis, Missouri, and is engaged as a common carrier by railroads in the States of Missouri, Tennessee, Kansas, Oklahoma, Alabama, and Florida. Defendant Armco Steel Corporation, hereinafter called "Armco", is a corporation organized under the laws of the the State of Ohio, with its principal place of business in Middletown, Ohio, and is authorized to do business within the State of Missouri. Defendant Pullman Incorporated is a corporation organized under the laws of the State of Delaware, having its principal place of business in Chicago, Illinois. It is authorized to do business in Missouri. Third-party defendant Maryland Casualty Company is a stock insurance company, organized under the laws of the State of Maryland, with its principal place of business outside the States of Missouri and Illinois, and is authorized to do business in the States of Missouri and Illinois.
2. Plaintiff Frisco seeks to recover regarding the rejection of the comparaone of its trains derailed. Plaintiff alleges that the derailment was the result of a defective and unreasonably dangerous wheel which was manufactured by defendant Armco and installed by Pullman on a railroad car which was built and sold by Pullman to the plaintiff's lessor Trailer Train Company. Plaintiff's theory is strict liability in torts under section 402A, Restatement of Torts, Second. By cross-claim Pullman seeks indemnity against Armco in the event judgment is entered against it and by third-party claim Pullman seeks to be declared an insured under Armco's liability policy of insurance issued by Maryland Casualty Company.
3. In May 1966, Pullman agreed to manufacture and Trailer Train agreed to purchase 156 railroad cars described as 89 foot lo dek flatcars. Trailer Train is a corporation, the stock of which is owned by railroads doing business in the United States, of which Frisco owns approximately two and one-half percent of the stock. Trailer Train leases railroad cars to the various railroads throughout the United States.
4. Armco manufactured the wheel in question. This wheel was made according to specifications of the American Association of Railroads, of which Frisco is a member. The wheel was inspected at the Armco factory for compliance with AAR specifications by railroad inspectors employed by the Pennsylvania Railroad and working under contract to Trailer Train Company. The wheel in question was purchased by Pullman. A hole was drilled in the center of the wheel, which was placed on the axle of a railroad car, delivered to Trailer Train, and this car was used by various railroads throughout the United States. On December 18, 1969, the car in question was loaded with fifteen new Chrysler automobiles at Valley Park, Missouri, and on December 19, 1969, was involved in a derailment near Chelsea, Oklahoma.
5. The car in question involved in the derailment was more or less in continuous service from May 1966 until the derailment in December 1969. The damage to plaintiff as a result of the derailment was $745,170.49.
6. The American Association of Railroads conducts continuous tests on various parts of railroad equipment, including railroad wheels and it sets the standards by which these wheels must be manufactured. Before a change can be made in specifications, it is necessary that all *762 the railroads that are members approve these changes in specifications. Each railroad car, including the wheels, as it passes from one railroad to another at interchanges is inspected by the railroad receiving the car. In the manufacture of the particular wheel in question, there are scale pits on the surface of the wheel. This is a normal process for railroad wheels and it is also undisputed that scale pits may be removed by shot peening each wheel at an extra cost of approximately $1.00 per wheel. Scale pits increase the possibility of metal fatigue. Scale pits may also be removed by grinding the wheel, but such was not called for in the specifications. One of the disputed questions in this case is the cause of the wheel's failure. There is no question that metal fatigue caused the wheel to break down. The expert testimony was that the metal fatigue occurred at the cracks in the wheel which were in the vicinity of the scale pits. However, the mate wheel, that is the wheel on the other end of the axle, was also cracked, which would indicate some unusual stress on the wheel which broke and on its mate wheel.
7. In this case, Trailer Train by agreement with the Pennsylvania Railroad caused the wheel made by Armco and the car made by Pullman to be inspected at those respective plants by inspectors employed by Pennsylvania Railroad. The evidence further shows that Armco's personnel inspected the wheel involved here and Armco, pursuant to Trailer Train's requirements, certified to Pullman that the wheel conformed to the American Association of Railroads specifications. While there is a dispute between the parties, the Court finds that the wheel in question did conform to the American Association of Railroads specifications.
8. The existence of fatigue cracks in railroad wheels is not unusual in the railroad industry and that is one of the reasons for inspections at interchanges. The manual of the American Association of Railroads requires that a wheel showing signs of fatigue cracks must be removed from service.

Conclusions of Law
1. This Court has jurisdiction by virtue of diversity of citizenship of the parties and the amount in controversy exceeds the sum of $10,000.00.
2. The Court is of the opinion that plaintiff was caused harm by reason of a product which when sold was in a defective condition unreasonably dangerous to the user or consumer or to his property. Within the concept of strict liability, a defective condition is one not contemplated by the user which will be recovery in this cause must comply with the strict liability theory in Torts, section 402A, of Restatement of Torts, Second, which Missouri has adopted, Keener v. Dayton Electric Manufacturing Co., 445 S.W.2d 362 (Mo.1969).
3. An essential requirement of a strict liability case is proof that the dangerous to him. By "unreasonably dangerous" is meant that the product must be dangerous to an extent beyond that contemplated by those having the ordinary knowledge of the community as to the characteristics of the product. Railroads, including, of course, the plaintiff railroad, are the sole ultimate purchasers and users of railroad cars and wheels and the Court finds that Frisco fully contemplated all the characteristics of the wheel in question and that the wheel was neither defective nor unreasonably dangerous.
4. Judgment will be entered for both defendants and against the plaintiff. In view of this finding, Pullman has sustained no loss to Frisco and consequently on its cross-claim for indemnity against Armco, the issues are moot and Pullman's cross-claim for indemnity will be dismissed.

Findings of Fact and Conclusions of Law as to Third-Party Claim by Pullman Against Maryland Casualty Company

Findings of Fact
1. At the time of the accident Pullman was insured for its liability under an umbrella policy issued by Lloyds of London. This policy provided that *763 Lloyds was liable only for an amount in excess of $100,000.00. The policy further provided that if other valid and collectible insurance was available to the insured, the Lloyds policy should not contribute with such other insurance. The Lloyds policy further provided that the underwriters would not be required to assume charge of the defense of a lawsuit. Attorneys' fees and reasonable expenses incurred by Pullman totalled $30,989.01.
2. At the time of the accident Maryland Casualty Company insured Armco's liability in limits of $500,000.00. This policy contains the following provisions:
"B) With respect to the Products-Completed Operations Hazard, the unqualified word `insured' includes the named insured and any other person or organization with respect to the distribution or sale, in the course of business of such person or organization, of goods or products manufactured, sold, handled or distributed by the named insured, subject to the following provisions:
1. The insurance does not apply to any person or organization who:
(a) Changes the form of such goods or products out of which the accident arises;
(b) repacks such goods or products out of which the accident arises;
(c) performs any demonstration, installation, servicing or repair operations, out of which the accident arises, in connection with such goods or products away from the premises of such person or organization.
2. The inclusion of more than one insured shall not operate to increase the limits of the company's liability."
"(h) Products Hazard. The term `products hazard' means
(1) goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the occurrence occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such occurrence occurs away from premises owned, rented or controlled by the named insured, provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine, or any property, other than such container, rented to or located for use of others but not sold;
(2) operations, if the occurrence occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be `operations' within the meaning of this paragraph:"
3. Pullman smooth bored a hole in the wheel in question and installed it on a car. The accident occurred away from the premises of the party claiming coverage.

Conclusions of Law
1. This Court has jurisdiction by virtue of pendant jurisdiction and by virtue of diversity of citizenship and the amount originally claimed exceeds $10,000.00.
2. The amount of expenses and attorneys' fees incurred are excluded under the terms of the policy.
3. Judgment will be entered for Maryland Casualty Company and against Pullman on its third-party claim.